## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
**LAWRENCE HARDING,**                           )
)
**Plaintiff,**                           )
)
**v.**                           )          **Civil Action No. 12-11437-DJC**
)
**CAROLYN COLVIN, Acting Commissioner,**        )
**Social Security Administration,**             )
)
**Defendant.**                           )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                      **December 7, 2015**

### I.    Introduction

On or about November 8, 2006 and April 26, 2007, Plaintiff Lawrence Harding

("Harding") filed claims for Social Security disability insurance benefits ("SSDI") and

supplemental security income ("SSI") with the Social Security Administration ("SSA").[1]  R. 85-

86.[2]  Pursuant to the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), Harding brings

this action for judicial review of the final decision of Carolyn Colvin, Acting Commissioner of

the Social Security Administration ("the Commissioner"), issued by Administrative Law Judge

("ALJ") Robert J. Kelly on August 30, 2011.  D. 1.  Before the Court is Harding's motion to

reverse and remand the ALJ's decision and the Commissioner's motion to affirm the ALJ's

---

[1] Harding later filed claims for SSI and SSDI benefits in July 2009 and the Disability Review Board ordered the ALJ to "associate the claim files and issue a new decision on the associated claims."  R. 59; see Application Summary for Disability Benefits, R. 191-97; Application Summary for Supplemental Security Income, R. 198-204.

[2] "R." refers to citations to the administrative record, D. 21.

decision.  D. 25, 30.  For the reasons discussed below, the Court DENIES Harding's motion to reverse and GRANTS the Commissioner's motion to affirm.

## II.       Factual Background

In his applications for SSDI and SSI, Harding alleged that he was unable to work due to the following conditions:  polysubstance abuse disorder, asthma, post-traumatic stress disorder ("PTSD"), bipolar disorder, Hepatitis C, sleep disturbance, intermittent explosive disorder, depression, anxiety and fibromyalgia.  R. 225, 2615.  Harding previously worked in construction, as a silkscreen printer and as a car salesman.  R. 2610.  Harding initially alleged a disability onset date of November 30, 2004.  R. 2608-09.  However, on June 21, 2011, at a hearing held before the ALJ, Harding's attorney amended the onset date to March 1, 2007.  Id.

## III.      Procedural Background

Harding filed applications for SSDI and SSI benefits on or about November 8, 2006 and April 26, 2007, respectively.  R. 85-86.  On August 3, 2007, the SSA denied the claims.  R. 188-90.  Harding filed a request for review by a Federal Reviewing Official.  R. 181.  On February 6, 2008, the Federal Reviewing Officer upheld the SSA's denial of the claims.  R. 87-93.  At Harding's request, a hearing was held before an ALJ on December 10, 2008.  R. 63-69, 174.  By a decision dated January 20, 2009, the ALJ determined that Harding was not disabled within the meaning of the Social Security Act and denied his claims.  R. 94-105.  On April 27, 2009, the Disability Review Board did not act on Harding's claims, rendering the ALJ's decision final.  R. 60-62.

On July 29, 2009, Harding commenced a civil action in this Court (Gertner, J.).  Harding v. Astrue, 09-cv-11277-NG.  The Commissioner moved to remand the case to the SSA for further administrative proceedings pursuant to 42 U.S.C. § 405(g).  On October 5, 2009, the

Court granted the Commissioner's motion to remand and the Disability Review Board then remanded the case to the ALJ.  R. 55-59, 141.  On June 21, 2011, the ALJ held a hearing where Harding, a medical expert and a vocational expert testified.  R. 2606-43.  On August 16, 2011, the ALJ held a supplemental hearing where the vocational expert testified again.  R. 2644-49.  In a decision dated August 30, 2011, the ALJ again determined that Harding was not disabled within the meaning of the Social Security Act and denied his claims.  R. 13-34.  On September 26, 2011, Harding filed objections with the Appeals Council.  R. 10-12.

On August 5, 2012, Harding commenced this civil action.  D. 1.  On January 4, 2013, the Commissioner moved for remand so the Appeals Council could consider Harding's objections, which were previously misplaced and thus never considered.  D. 10.  On January 10, 2013, the Court granted the parties' assented to motion to remand.  D. 12.  On remand, the Appeals Council reaffirmed the ALJ's decision on May 15, 2013, making the August 30, 2011 decision final.  R. 7-9.  On January 22, 2015, this Court reopened this action.  D. 17.

### IV.    Discussion

#### A.    Legal Standards

##### 1.    Entitlement to Disability Benefits and Social Security Income

A claimant's entitlement to SSDI and SSI depends on whether he has a "disability," which is defined within the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505. The physical or mental impairment(s) must be severe, in that they make the claimant unable to

do his previous work or any other substantial gainful work which exists in the national economy. See 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505.

The Commissioner follows a five-step process to determine if an individual is disabled. 20 C.F.R. § 416.920; see Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001). First, the SSA determines if the applicant is engaged in substantial gainful work activity, and if so, the application is denied. 20 C.F.R. § 416.920. Second, if the applicant does not have or has not had within the relevant time period a severe medically determinable impairment or combination of impairments, the application is denied. Id. Third, if the impairment meets or equals one of the "listed" impairments in the Social Security regulations, the application is granted. Id. Before moving to step four, the SSA assesses the applicant's residual functional capacity ("RFC"). Id. Fourth, if the applicant's RFC is such that he can still perform past relevant work, the application is denied. Id. Fifth, if the applicant, given his or her RFC, education, age and work experience, is unable to do any other work, the application is granted. Id.

### 2.   Standard of Review

The Court may affirm, modify or reverse the Commissioner's decision upon review of the record. See 42 U.S.C. § 405(g). This review is limited, however, "to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). As the Commissioner's role is "to draw factual inferences, make credibility determinations, and resolve conflicts in the evidence, the Court must not perform such tasks in reviewing the record." Whitzell v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (citing Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991)).

The Court must accept the Commissioner's factual findings as conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g). Substantial evidence exists where "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). The Court must adhere to these findings of fact "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzell, 792 F. Supp. 2d at 148 (quoting Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). However, if the ALJ made a legal or factual error, "the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard." Martinez-Lopez v. Colvin, 54 F. Supp. 3d 122, 129 (D. Mass. 2014) (citation and internal quotation marks omitted).

## B. **Before the ALJ**

### 1. *Medical History*

There was extensive evidence regarding Harding's medical history before the ALJ, including diagnoses and treatments.

#### a. Physical Impairments

From 2007 through 2011, the administrative record indicates that Harding received treatment primarily at the Bedford V.A. Medical Center ("Bedford VA") and also at the Boston V.A. Medical Center ("Boston VA"). R. 273-510, 532-816, 839-1254, 1260-1281, 1352-2152, 2159-2380, 2393-2599. In March 2007, Harding reported problems with his knees and an x-ray was taken, showing knee arthritis with a torn meniscus and a lumbar sprain with arthritis. R. 294-96. Also in March 2007, Harding went to the Bedford VA for a gastroenterology consultation and was diagnosed with gastro-esophageal reflux disease and dysphagia. R. 297. In

April 2007, Harding saw a physical therapist for his neck, back and knee pain.  R. 391-94.  The physical therapist noted that the radiology tests revealed a normal lumbar spine and an abnormal curvature of the cervical spine.  R. 392.

In April 2009, Harding saw an orthopedic professional at the Bedford VA for his low back pain and knee pain.  R. 1629-31.  The orthopedic professional determined that Harding's knees were normal and had a full active range of motion and Harding was "eligible for walking and standing as tolerated."  R. 1631.  From March 2009 through September 2009, the administrative record indicates that Harding received treatment for his Hepatitis C.  R. 1628, 1554.  The treatment caused fatigue, aches and pains.  R. 1600.  Dr. Agnello conducted a Hepatitis C RFC assessment of Harding.  R. 2601-05.  Dr. Agnello noted that Harding had side effects associated with the Hepatitis C treatment, such as chronic fatigue, difficulty concentrating, anemia and depression.  R. 2601.  Dr. Agnello concluded that the treatment's side effects may make Harding unable to work because the fatigue, pain and other symptoms would interfere with the attention and concentration needed to perform even simple work tasks.  R. 2602.  Dr. Agnello concluded that work would be limited only until the treatment was completed in three months.  R. 2604.

In May 2010, Harding was seen at the Bedford VA for his chronic pain.  R. 2449-50. The treating professional diagnosed Harding with fibromyalgia.  Id.  Harding took Lyrica (Pregabalin), Baclofen and Tramadol for this condition.  R. 2474.  He also received trigger point injections for his lower back and muscle pain.  Id.  In September 2010, Harding noted that he was feeling well and the medication alleviated his pain.  R. 2412, 2560.  In March 2011, Harding reported that his fibromyalgia was controlled and was advised to see a rheumatologist.  R. 2499.

b.   Mental Impairments

In July 2007, Harding received a psychiatric review, which found he had non-severe impairments of affective disorders and substance addiction disorders.  R. 817.  It was determined that these impairments only mildly limited Harding's daily living activities, social functioning and concentration, persistence or pace.  R. 827.

In September 2008, the mental health professionals at the Bedford VA evaluated Harding.  R. 2218.  The treating professional noted that Harding had diagnoses of bipolar disorder, PTSD due to his childhood abuse and involvement in two fires, intermittent explosive disorder and polysubstance abuse in remission.  R. 2219.  It was also noted in April 2007 that Harding was previously enrolled in a program for his substance abuse but was discharged due to benzodiazepine use.  R. 2219.  Harding later explained that his discharge was wrongful because he took an aspirin with codeine in it.  R. 2622.  At the September 2008 mental health evaluation, Harding reported that he was working part-time and enrolled at Middlesex Community College.  R. 2219.  Harding reported that he enjoyed doing activities with his children, gardening and going to the gym a couple of times per week.  Id.  He also reported sometimes feeling anxious, having racing thoughts, mood swings and difficulty sleeping.  R. 2219-21.

In October 2008, Harding was evaluated by Dr. Krieger, a psychiatrist at the Bedford VA.  R. 2211.  They discussed a plan to manage his chronic pain, poor sleep, anxiety, irritability and depression.  Id.  Dr. Krieger reported that Harding had a normal affect aside from a depressed mood and an anxious affect within the normal in range.  Id.  Dr. Krieger prescribed Harding a trial of Depakote and Levitra, changed his Zoloft to Prozac and increased his Trazodone and Gabapentin.  R. 2211-12.  In November 2008, Harding was again evaluated by mental health professionals at the Bedford VA.  R. 2196.  He was described as alert, cooperative,

engaged and having a subdued affect and good eye contact throughout the interview.  R. 2200.

The professional noted that Harding was enrolled at Middlesex Community College, working

part-time in construction and attending church on the weekends.  R. 2199-2200.

In December 2008, Dr. Krieger conducted an RFC assessment of Harding and determined

that he was markedly limited in the following abilities:  carrying out detailed instructions,

maintaining attention and concentration for extended periods, performing activities within a

schedule, maintaining regular attendance, being punctual within customary tolerances,

completing a normal workday and workweek without interruptions from psychologically based

symptoms, performing at a consistent pace without an unreasonable number and length of rest

periods, asking simple questions or requesting assistance, accepting instructions, responding

appropriately to criticism from supervisors, traveling in unfamiliar places and using public

transportation.  R. 2154-55.  Dr. Krieger determined that Harding was disabled from substantial

gainful employment and if he attempted to work, he expected that Harding would miss at least

three days of work a month.  R. 2158.

 In March 2009, Harding again saw Dr. Krieger.  R. 2186.  Harding reported that he

stopped attending therapy and his mental condition was declining.  Id.  Harding was prescribed

Wellbutrin and was urged to make an appointment with his therapist.  R. 2188.  In June 2009,

Harding was seen by a mental health professional at the Bedford VA.  R. 2298.  The treating

professional noted that Harding had not had an appointment since December 2008 because he

missed appointments and did not return their phone calls.  R. 2298.  Harding reported that he had

stopped taking Depakote, Wellbutrin, Prozac, Remeron and Levitra.  R. 2301.  Harding agreed to

resume Wellbutrin, Depakote and Prozac.  Id.  In July 2009, Harding was again seen by a mental

health professional at the Bedford VA.  R. 2271.  Harding "[a]ppeared less anxious and brighter

than last session." Id.  Harding began working through the VA's cooperative working therapy program that week.  Id.

In January 2010, Dr. Krieger again conducted an RFC assessment of Harding.  R. 2382-86.  Dr. Krieger concluded that Harding was disabled from substantial gainful employment and if he attempted to work, Harding would be expected to miss at least three days of work a month.  R. 2386.  Dr. Krieger noted Harding's current diagnoses at the time of the assessment:  bipolar disorder, intermittent explosive disorder, polysubstance abuse in sustained full remission, nicotine dependence and PTSD.  Id.  Dr. Krieger determined that Harding had marked limitations in the following abilities:  remembering locations and work-like procedures, understanding and remembering detailed instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors.  R. 2382-83.

In April 2010, Harding saw Dr. Krieger again.  R. 2327.  Harding was evaluated as having an anxious affect and a depressed mood, but otherwise appeared normal.  Id.  Dr. Krieger increased Harding's Seroquel prescription.  R. 2328.  In July 2010, Dr. Krieger saw Harding who noted that he stopped taking Prozac and had not been taking Wellbutrin regularly.  R. 2437.  Dr. Krieger noted that it was unclear how Harding was diagnosed with bipolar disorder because the record did not have any evidence supporting the diagnosis.  Id.

In August 2010, Dr. Krieger conducted another RFC assessment of Harding.  R. 2388-92.  Dr. Krieger determined that Harding was markedly limited in the following abilities:  carrying

out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, traveling in unfamiliar places and using public transportation. R. 2388-89. Dr. Krieger noted that Harding's current diagnoses at the time of the RFC were PTSD and intermittent explosive disorder. R. 2392. Dr. Krieger concluded that Harding was disabled from substantial gainful employment. Id.

Harding again saw Dr. Krieger in September 2010. R. 2407. Harding reported that the medication helped to reduce his anxiety. R. 2409. He also reported feeling depressed "nearly all day every day." Id. Dr. Krieger evaluated Harding as awake and alert, cooperative, with a mildly anxious affect and a depressed mood. Id. Dr. Krieger increased Harding's Buspar prescription and discontinued Gabapentin and the nicotine patch. R. 2410. In December 2010, Harding was evaluated by a mental health professional at the Bedford VA. R. 2560-61. Harding completed a Patient Health Questionnaire (PHQ-9), which measured his depressive symptoms in the last two weeks. Id. Harding received a score of 11, which indicated a moderate level of depression. Id. Harding also completed a PTSD checklist, which measured his PTSD symptoms. Id. He received a score of 62 out of 85 on the PTSD checklist–a score of 50 is the recommended cutoff suggesting a PTSD diagnosis. Id. Harding also completed a questionnaire and the result suggested a moderate level of well-being. Id.

### 2. SSA Records

On September 8, 2009, Dr. Siegel, a state agency consultant, conducted a physical RFC assessment of Harding. R. 1311-18. Dr. Siegel determined that Harding had some exertional limitations, but would be able to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk for about six hours in an eight hour workday, sit for about six hours in an eight hour workday, climb, balance, stoop, kneel, crouch and crawl. R.1312. Dr. Siegel determined that Harding was limited in pushing foot controls and occasional grasping and twisting. R. 1312-14. Dr. Siegel determined that Harding should avoid dust and fumes, driving, heights, hazardous machinery and sharp instruments. R. 1315.

On September 19, 2009, Dr. Metcalf, a state agency consultant, conducted a mental RFC assessment of Harding. R. 1319-36. Dr. Metcalf noted that Harding had bipolar disorder, PTSD, intermittent explosive disorder and a history of polysubstance abuse in remission. R. 1321. Dr. Metcalf noted that Harding stopped taking his psychiatric medications, which lead to an increase in his depression. R. 1321; see R. 2301 (Harding reported that he had stopped taking Depakote, Wellbutrin, Prozac and Remeron). Dr. Metcalf, however, noted that Harding restarted his medication, was gradually improving and had a history of improving with treatment. R. 1321. Dr. Metcalf determined that Harding had only minimal limitations in his ability to do any basic work activity and no marked limitations in any of his abilities. R. 1319-20, 1333. Dr. Metcalf concluded that Harding could understand instructions, sustain focus and pace on simple tasks, work in settings with low social demands and supportive others and work in low stress work settings. R. 1321.

### 3. ALJ Hearing

At the June 21, 2011 administrative hearing, the ALJ heard testimony from Harding, medical expert Dr. Alfred Jonas and vocational expert ("VE"), Robert Laskey.  R. 2606-43.

### a.   Harding's Testimony

Harding testified he last worked in construction, doing various jobs such as painting, roofing, framing and basement work.  R. 2610.   He also previously worked as a silkscreen printer and a car salesman.  Id.   Since March 2007, Harding had been involved in several programs run through the U.S. Department of Veterans Affairs ("VA").  R. 2611.  Harding also stated that he tried working after the alleged onset date for a couple of days in a row.  R. 2623. Harding also began college classes in September 2008, but did not finish them.  R. 2623-24.  He cited memory problems as one of the reasons.  Id.

Harding testified that he is prevented from working mainly due to his mental conditions of PTSD, depression and anxiety as well as his sleep problems.  R. 2615.  He testified to having anxiety attacks multiple times a week, which were usually triggered by going outside, being around crowds and driving.  R. 2620.  Harding stated that he has anger issues, which he had been addressing through "PTSD classes."  R. 2618-19.

In terms of physical impairments, Harding testified that he had fibromyalgia for about a year prior to the hearing.  R. 2615.  Harding stated that he relied upon fibromyalgia medication to get through the day.  Id.   Harding testified that he was always in pain at some level, but usually had two pain-free days, three medium-pain days and two days of "really bad" pain.  R. 2615-16.  On days when he was in really bad pain, Harding said that he took the maximum dose of medications.  Id.  Harding testified that his asthma had not been bad and he had an inhaler and medication for when his asthma acts up.  R. 2620.

b.   Medical Expert's Testimony

At the hearing, Dr. Jonas testified that an MRI revealed that Harding had a torn meniscus in his left knee, but could not tell from the records whether this created "any meaningful restrictions or limitations." R. 2625. Dr. Jonas noted that the records indicated, following the meniscus tear, that Harding was working out at the gym a few days per week and working about twenty hours per week in construction, painting and carpentry. R. 2625. Regarding the asthma condition, Dr. Jonas testified that Harding would probably have pulmonary restrictions and limitations and would need the availability of an inhaler. R. 2626. In discussing Harding's bipolar disorder diagnosis, Dr. Jonas opined that nothing in the record supported the diagnosis and stated that bipolar disorder diagnoses are over applied. R. 2629. Dr. Jonas testified that there was potential for PTSD because the symptoms described are consistent with such a diagnosis. R. 2629-30. He also testified that he did not see any demonstration of intermittent explosive disorder based on Harding's record. R. 2630. Dr. Jonas believed that Harding had a mild social functioning impairment, but not a concentration, persistence or pace problem. R. 2631-32. Dr. Jonas also testified that Harding did not have any episodes of decompensation. R. 2633.

The medical expert noted Harding's Hepatitis C diagnosis and treatment and stated that Harding would have had an exertional impairment during the time of the treatment. R. 2632. Regarding Harding's fibromyalgia diagnosis, Dr. Jonas said that he had not "been able to do anything with it" because Harding is functional. R. 2634. He noted the difficulty of analyzing a fibromyalgia diagnosis, stating that "[t]here's no way, frankly, to know if anyone has fibromyalgia . . . [a]nd all anybody really can do is either assume that fibromyalgia exists or it doesn't. And if you assume that it does, then you sort of have to accept at face value anything

the patient tells you about their condition."   R. 2633.   Dr. Jonas said, assuming Harding had

fibromyalgia, he was functional.   R. 2634.   Harding's counsel questioned Dr. Jonas about

fibromyalgia, R. 2635-36, and Dr. Jonas acknowledged that he did not believe that fibromyalgia

existed and understood that this opinion was contrary to the Commissioner's position.   Id.

During the hearing, Dr. Jonas noted that he received a large stack of Harding's records the day

before the hearing and "didn't give them [his] usual level of attention."   R. 2636.

### c.   Vocational Expert's Testimony

At the hearing on June 21, 2011, the ALJ asked the VE that "consider[ing] Mr. Harding's

age, his education . . . [a]nd work experience, as testified.   And from a longitudinal standpoint,

considering the exertional and nonexertional issues that he has, if the medical evidence would

support severe levels, could he obtain sustained work?"   R. 2640.   The VE replied no and

described the basis for his answer:

> If these conditions that he's testified to, including severe major depressive
> disorder with severe pain, having only two good days in a typical week, having a
> sleep disorder, anxiety, as he's testified to, possible PTSD and having a severe
> nature, this would lead to and which I would interpret as being similar to a
> marked impairment.   This is a serious limitation in this condition and this would
> mean a substantial loss in his ability to effectively function.

Id.   If instead "the medical evidence would support sedentary or light work activity," the VE

testified that Harding could return to his work as a silkscreen printer or car salesman or could be

an electrical equipment inspector, a photocopy machine operator or a hand trimmer.   R. 2640-41.

At the supplemental hearing on August 16, 2011, the ALJ presented the following

hypothetical to the same VE:

> assume a hypothetical individual who could perform work at the light exertional
> level, except that he would be subject to the following limitations.   This person,
> such as the claimant, could occasionally climb, balance, stoop, kneel, crouch, or
> crawl.   This hypothetical person would be limited to occasional pushing of foot
> controls with his bilateral lower extremities.   In addition, this person should avoid

concentrated exposure to extreme temperatures, pulmonary irritants and hazards such as dangerous machinery, unprotected heights. This person could understand simple instructions and could sustain focus, pace on simple tasks for two-hour increments throughout the eight-hour day. This person could tolerate occasional, superficial interaction with coworkers, supervisors or the general public. Finally, this person could tolerate occasional changes in the work setting and could perform work requiring occasional judgment and decision-making. Based on that hypothetical, what jobs could an individual such as the one posed in my hypothetical, perform?

R. 2646-47.  The VE testified that such a hypothetical person could work as a photocopy machine operator, a mail clerk or a small products assembler—all jobs existing in the national economy.  R. 2647-48.

### 4.  Findings of the ALJ

Following the five-step process outlined in 20 C.F.R. § 416.920, at step one, the ALJ found that Harding was not engaged in substantial gainful activity and had not been since March 1, 2007, the alleged onset of date of disability.  R. 19.  At step two, the ALJ found that Harding had severe impairments of fibromyalgia, a meniscus tear of the left knee, asthma, intermittent explosive disorder and PTSD.  R. 21.  At step three, the ALJ determined Harding did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the Social Security regulations.  R. 22.  At step four, the ALJ found that Harding had the RFC to:

perform light work . . . except that he could only occasionally climb, balance, stoop, kneel, crouch, or crawl, and would be limited in his ability to push foot controls with his bilateral lower extremities. In addition, the claimant should avoid concentrated exposure to extreme temperatures, pulmonary irritants, and hazards such as dangerous machinery or unprotected heights. The claimant could understand simple instructions and sustain focus/pace on simple tasks for two-hour increments throughout an eight-hour workday. The claimant could tolerate occasional, superficial interaction with co-workers, supervisors, or the general public. Finally, the claimant could tolerate occasional changes in the work setting, and could perform work requiring occasional judgment and decision-making.

R. 25.  Based on this RFC assessment, the ALJ concluded that Harding was unable to perform

his past relevant work.  R. 32.  At step five, the ALJ found that there were jobs in "significant

numbers in the national economy" that Harding could perform.  R. 33.  Accordingly, the ALJ

concluded Harding was not disabled as defined in the Social Security Act.  R. 34.

### C.      Harding's Challenges to the ALJ's Findings

Harding challenges the weight given by the ALJ to the various expert opinions.

Specifically, Harding argues that:  (1) the ALJ should have given controlling weight to the

opinion of his treating psychiatrist, Dr. Krieger, D. 26 at 14; (2) the ALJ was obligated to

recontact Dr. Krieger, id. 17-19; (3) the ALJ should not have relied on the SSA's medical expert,

Dr. Jonas, id. at 19-20, and; (4) the ALJ should not have granted the state agency consultants'

opinions "great weight," id. at 22-23.  Harding further argues that the Court should reverse the

matter for payment of benefits, rather than remand it for further proceedings.  Id. at 23-25.  For

the reasons discussed below, the Court concludes that the ALJ did not err in his assignment of

weight to the various expert opinions and his decision is supported by substantial evidence.

#### 1. The ALJ Did not Err in Determining Weight as to the Treating Psychiatrist's Opinion

First, Harding argues that the ALJ should have granted Dr. Krieger's opinion controlling

weight because he was Harding's treating psychiatrist.  D. 26 at 14.  Harding contends that the

ALJ erred in "disregarding the treating physician's opinion as insufficient, unsupported or

ambiguous without proactively requesting clarification due to the non-adversarial nature of the

proceedings."  Id. at 17.

To begin, an "ALJ is not obligated automatically to accept [a treating physician's]

conclusions."  See Moore v. Astrue, No. 11-cv-11936-DJC, 2013 WL 812486, *7 (D. Mass.

Mar. 2, 2013) (citation and internal quotation marks omitted) (alteration in original).  A treating

source's opinion on the nature and severity of an applicant's impairment(s) is given controlling weight if an ALJ finds that the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [an applicant's] case record . . . ." 20 C.F.R. § 404.1527(c). An ALJ can give less weight to a treating physician's "assessment of the nature and severity of an impairment where . . . it is internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." Shields v. Astrue, No. 10-cv-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011) (alteration in original) (citation and internal quotation marks omitted).

If an ALJ determines that the treating physician's opinion is not entitled to controlling weight, an ALJ considers six factors to determine the proper weight to give the opinion: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) supportability of the treating source's opinion; (4) consistency of an opinion with the record as a whole; (5) specialization of the treating source, and; (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). An ALJ must give good reasons for the determination of the weight that will be given to the treating source's opinion. See id.

Here, the ALJ did not err in giving Dr. Krieger's opinion "minimal probative weight" because it was inconsistent with other substantial evidence in the record. R. 30-31. Specifically, the ALJ stated that the record as a whole revealed Harding as someone "with some limitations due to severe mental and physical impairments," "who has worked hard to overcome substance abuse disorders" and "retains the ability to perform work activities, help others with their own substance abuse issues, and serve as a strong role model to his adolescent son." Id.

Using the factors outlined in 20 C.F.R. § 404.1527(c), the ALJ provided "good reasons" for not giving Dr. Krieger's opinion controlling weight.  R. 31.  The ALJ considered the infrequency of examinations with Dr. Krieger, the nature of the relationship between Dr. Krieger and Harding, the manner in which Dr. Krieger arrived at his opinion and the inconsistency of Dr. Krieger's opinion with the record as a whole.  See id.  Although Dr. Krieger was Harding's psychiatrist for years, the ALJ determined that "the record does not reflect a history of frequent thorough discussions of the claimant's mental health impairments."  Id.  Rather, Dr. Krieger and Harding appear to have met occasionally mostly to adjust Harding's medications.  See id.  The ALJ determined that such a relationship did not put Dr. Krieger in a "strong position to judge the claimant's abilities and limitations."  Id.

The ALJ also considered the nature in which Dr. Krieger proffered his opinion.  See id.  Dr. Krieger used an RFC Assessment form typically used by state agency consultants in the disability context in concluding that Harding was disabled.  Id.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the SSA] will determine that you are disabled."  20 C.F.R. § 404.1527.  The ALJ, not the treating physician, makes the ultimate decision about whether a claimant is disabled.  See id.

Additionally, Dr. Krieger's opinions in the RFC assessment were inconsistent with his own opinions in prior RFCs.  In a January 2010 RFC assessment, Dr. Krieger stated that Harding had a current diagnosis of bipolar disorder.  R. 2386.  However, in July 2010, Dr. Krieger stated that there was no evidence in the medical record to support a bipolar disorder diagnosis.  R. 2438.  Additionally, in Dr. Krieger's January 2010 RFC assessment, he evaluated Harding as having marked limitations in the following abilities:  remembering locations and work-like procedures, understanding and remembering detailed instructions, working in coordination with

and proximity to others without being distracted and traveling in unfamiliar places.  R. 2382-83.

However, months later in his August 2010 RFC assessment, Dr. Krieger determined that these

limitations were not marked, but rather were "not significantly limited" or only "moderately

limited."  R. 2388-89.

Dr. Krieger's opinion is also inconsistent with the opinions of the medical examiner and

the state agency consultants, all of whom concluded that Harding was not disabled.  It is also

inconsistent with substantial evidence in the record.  For example, there are numerous times

where Harding reported that he was working or wanted to work.  See, e.g., R. 2113, 2199-2200,

2267, 2268, 2271, 2334, 2340, 2506, 2517, 2580.  As recently as February 2011, Harding

reported that he applied for work through the VA's cooperative work therapy program and he

wanted to work part time.  Id.  Harding reported that his medication helped his fibromyalgia "a

lot" and he was feeling much better than before.  R. 2506, 2512.  The record also indicates that

there were times when Harding reported "feeling good."  R. 2218, 2270, 2339.  The record

references Harding's interest in hobbies such as going to the gym and spending time with his

children—activities requiring a certain degree of mental and physical ability.  R. 2219, 2271,

2585.  Additionally, Harding reported taking classes at Middlesex Community College.  R. 2219.

Since Dr. Krieger's opinion is inconsistent with other substantial evidence in the record,

"the requirement of 'controlling weight' does not apply."  See Shaw v. Sec'y of Health &

Human Servs., No. 93-2173, 1994 WL 251000, at *3 (1st Cir. 1994); Keating v. Sec'y of Health

& Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (citation omitted) (recognizing that "[a]

treating physician's conclusions regarding total disability may be rejected by the Secretary

especially when, as here, contradictory medical advisor evidence appears in the record").

Ultimately, the determination of whether the claimant is disabled is reserved for the

Commissioner, R. 31, and "the opinion of a treating physician that a claimant is unable to work is entitled to no deference at all (as it is not a medical opinion)." <u>Foley v. Astrue</u>, No. 09-cv-10864-RGS, 2010 WL 2507773, at *8 (D. Mass. June 17, 2010) (citation omitted); <u>see</u> 20 C.F.R. §§ 404.1527(d). Accordingly, the ALJ did not err in declining to give Dr. Krieger's opinion controlling weight.

### 2. *The ALJ Did Not Err by Not Recontacting the Treating Psychiatrist*

Harding further argues that the ALJ was required to recontact his treating psychiatrist, Dr. Krieger, pursuant to 20 C.F.R. § 404.1512(e) and 20 C.F.R. § 416.912(e). D. 26 at 17. Those regulations changed, however, effective March 26, 2012. <u>See</u> How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651, 10651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404 and 416) (discussing modification of the "requirement to recontact your medical source(s) first when we need to resolve an inconsistency or insufficiency in the evidence he or she provided"). While the modification did not alter the requirement that ALJs make "every reasonable effort" to obtain medical evidence from the treating physician, the ALJ is no longer required to first recontact the treating source. <u>See id.</u> at 10652.

Nonetheless, the ALJ's final decision was rendered on August 30, 2011, when the original regulations governing the duty to recontact were still in effect. D. 26 at 16-34. Under the original regulations, "the ALJ has a duty to recontact the treating physician '[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled.'" <u>Cox v. Astrue</u>, No. 08-cv-10400-DPW, 2009 WL 189958, at *6 (D. Mass. Jan. 16, 2009) (alteration in original) (quoting 20 C.F.R. §§ 404.1512(e), 416 .912(e)); <u>see</u> Soc. Sec. Admin., SSR 96-5P, Titles II & XVI: Med. Source Opinions on Issues Reserved to the Comm'r (1996) (an ALJ must "make every

reasonable effort to recontact [treating] sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us").

The ALJ did not find that the evidence received from Dr. Krieger or the record as a whole was inadequate.  R. 30-31.  Rather, as discussed above, the ALJ found that Dr. Krieger's opinion that Harding was disabled was inconsistent with the record as a whole.  R. 31.  In disagreeing with Dr. Krieger's opinion, the ALJ was not required to recontact him because "the aspect of [the treating source's] report that the ALJ found inadequate was not the medical assessment, but rather the opinion of [the treating source] that the claimant is totally disabled, and [h]is conclusion that [the claimant] cannot do any work activity whatsoever" and such conclusions "are not medical findings." Cox, 2009 WL 189958, at *8 (internal quotation marks omitted).  Additionally, "where the evidence as a whole contains substantial evidence to support an ALJ's findings, he is not required to re-contact a treating source." Nichols v. Astrue, No. 10-cv-11641-DPW, 2012 WL 474145, at *11 n.5 (D. Mass. Feb. 13, 2012) (citation omitted).  In reaching his decision, the ALJ had thousands of pages of medical records, opinions from state agency consultants and two hearings where the ALJ heard testimony from Harding, a medical expert and a vocational expert.  Considering the record as a whole, the ALJ did not err in failing to recontact Dr. Krieger.

### 3. The ALJ Did Not Err in Determining Weight as to the Medical Expert's Opinion

Harding contends that the ALJ improperly relied upon the opinion of the SSA's medical expert, Dr. Jonas, because he admitted to "failing to properly review the medical records" and "disagreeing with the Social Security mandate on evaluating one of Mr. Harding's primary medical impairments (fibromyalgia)."  D. 26 at 19-20.

In weighing the opinions of non-treating sources, an ALJ considers the following factors: (1) the supportability of the treating source's opinion; (2) the consistency of an opinion with the record as a whole; (3) the specialization of the treating source, and; (4) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). An ALJ must explain his or her determination of the amount of weight given to a non-treating source's opinion. See 20 C.F.R. § 404.1527(e)(2)(ii). The opinions of "nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record." Hill v. Colvin, No. 13-cv-11497-DJC, 2015 WL 132656, at *9 (D. Mass. Jan. 9, 2015) (citation and internal quotation marks omitted). Additionally, an ALJ may "give greater weight to the testimony and reports of medical experts who are commissioned by the Secretary." See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 n.1 (1st Cir. 1988).

The Court concludes that the ALJ did not err in assigning "only some weight" to Dr. Jonas's opinion "to the extent that it is consistent with the residual function capacity assessment." R. 31. The ALJ decided to grant "only some weight" because he disagreed with certain aspects of Dr. Jonas's opinion. Id. Specifically, the ALJ determined that Harding's PTSD, intermittent explosive disorder and fibromyalgia were severe impairments. Id. The ALJ also took into consideration that Dr. Jonas did not spend the amount of time on the case that he typically spends reviewing medical evidence for a hearing. Id.

The ALJ did not entirely disqualify Dr. Jonas's opinion, however, because "Dr. Jonas's opinion is, in many instances, not inconsistent with the record as a whole . . . ." Id. For example, Dr. Jonas testified that there was nothing in Harding's medical record to support his diagnosis of bipolar disorder, which was consistent with Dr. Krieger's opinion. R. 2629. Additionally, Dr. Jonas's determination that Harding's symptoms were consistent with PTSD is

supported throughout the medical records.  R. 2630.  Dr. Jonas also testified that Harding's functioning would have been affected and he would have had an exertional impairment during his Hepatitis C treatment, which is consistent with Dr. Agnello's Hepatitis C RFC assessment. R. 2632.  For these reasons, the ALJ did not err in assigning "only some weight" to Dr. Jonas's opinion.

4. *The ALJ Did Not Err in Determining Weight as to State Agency Medical Consultants' Opinions*

Harding contends that the ALJ erred in granting the two state agency consultants' opinions great weight because they were stale.  Harding emphasizes that Dr. Siegel's and Dr. Metcalf's opinions were rendered in September 2009, two years before the ALJ rendered his decision on August 30, 2011. D. 16 at 22-23.  Specifically, Harding argues that the state agency consultants did not have the opportunity to review his fibromyalgia diagnosis and Dr. Krieger's opinions.  See id.

An ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence" because "[s]tate agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(e).  While ALJs are not bound by the opinions of state agency consultants, they cannot ignore them.  See Soc. Sec. Admin., SSR 96-6P, Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council (1996).

As the Court discussed, *supra*, an ALJ considers certain factors in determining the weight to grant a nontreating source's opinion.  Opinions of "nontreating, nonexamining sources may override treating doctor opinions, provided there is support for the result in the record." Alberts

v. Astrue, No. 11-cv-11139-DJC, 2013 WL 1331110, at *10 (D. Mass. Mar. 29, 2013) (citation and internal quotation marks omitted).  "[M]edical evidence too far removed from the relevant time period may not be utilized to serve as substantial evidence if there is an indication in the more recent records that there has been a significant change in the claimant's condition." Abubakar v. Astrue, No. 11-cv-10456-DJC, 2012 WL 957623, at *12 (D. Mass. Mar. 21, 2012) (citation omitted).  As such, an ALJ can rely upon older evidence when the information contained in that evidence remains accurate and "where the subsequently added medical evidence does not establish any greater limitations." D.A. v. Colvin, No. 11-cv-40216-TSH, 2013 WL 5513952, at *8 (D. Mass. Sept. 30, 2013); see Abubakar, 2012 WL 957623 at *12. Notably, "the opinions of non-treating medical examiners can be entitled to substantial weight where they had only most, but not all, of the evidence for their review." D.A., 2013 WL 5513952, at *8.

The ALJ's decision to afford "great weight" to the opinions of the two state agency medical consultants was supported by substantial evidence.  The ALJ granted Dr. Siegel's opinion great weight because he determined that it was consistent with the record as a whole and also gave Dr. Metcalf's opinion great weight because it was generally consistent with the record as a whole.  R. 32.  Regarding Dr. Metcalf's opinion that Harding experienced one or two episodes of decompensation, the ALJ noted that the record did not indicate evidence of a particular episode of decompensation.  Id.  For that reason, the ALJ afforded Dr. Metcalf's opinion great weight "to the extent that it is consistent with the residual functional capacity assessment." Id.

Here, the record does not demonstrate that the subsequently added medical evidence establishes any greater limitations.  The state agency consultants relied upon Harding's

diagnoses of bipolar disorder, depression, PTSD, intermittent explosive disorder and polysubstance abuse in remission—the same diagnoses that Dr. Krieger relied upon in his RFC assessment.   R. 1321, 2386, 2392.   Additionally, the evidence does not demonstrate that Harding's fibromyalgia diagnosis established any greater limitations.   The record reveals that by February 2011, the medication Harding was taking for his fibromyalgia "helped him a lot" and he reported feeling "much better than before."   R. 2506; see R. 2493, 2499, 2529 (noting that the fibromyalgia medication was effective and controlled Harding's fibromyalgia).   In fact, despite his fibromyalgia diagnosis, Harding expressed an interest in working part-time.   R. 2510; see R. 2517 (Harding reported that he was feeling better and was highly motivated to work).   Although the state agency consultants did not consider Harding's fibromyalgia diagnosis, the ALJ considered it when rendering his decision and found Harding's fibromyalgia to be a "severe impairment" under 20 CFR 416.920(c).   R. 21.   The ALJ also considered the effect of this impairment when he conducted his RFC assessment of Harding.   R. 24.   As such, the ALJ did not err in assigning great weight to the opinions of the state agency consultants.

*5.      Reversal for Payment of Benefits as Remedy*

Harding argues that if the Court reverses the Commissioner's decision, it should reverse his application for payment of benefits instead of remanding it for further administrative proceedings.   D. 26 at 23.   Harding argues that such a remedy is warranted because:  (1) he has already endured two hearings; (2) his file was misplaced, and; (3) he has waited eight years for his claims to be adjudicated.   Id. at 23-25.

For all the reasons discussed above, the Court finds that there is substantial evidence to support the ALJ's findings and thus there is no basis for the Court to reverse Harding's application for payment of benefits or remand it for further proceedings.   See Seavey v. Barnhart,

276 F.3d 1, 11 (1st Cir. 2001) (an award of benefits is appropriate "where the proof of disability

is overwhelming or where the proof is very strong and there is no contrary evidence").

**V.      Conclusion**

For the above reasons, the Commissioner's motion to affirm, D. 30, is ALLOWED and

Harding's motion to reverse, D. 25, is DENIED.

**So Ordered.**

/s/ Denise J. Casper<br>
United States District Judge